Affirmed by published opinion. Judge NIEMEYER wrote the majority opinion, in which Judge WIDENER joined. Judge KING wrote a dissenting opinion.
NIEMEYER, Circuit Judge.
When the news broke in October 2002 that police in Montgomery County, Maryland, had captured two black men suspected of being the snipers who had randomly shot 13 individuals, killing 10, in separate incidents over a period of weeks in Maryland, Virginia, and the District of Columbia, an IBM employee watching the news on television in one of IBM’s Montgomery County offices exclaimed, “They should put those two black monkeys in a cage with a bunch of black apes and let the apes f — k them.” A fellow employee, Robert Jordan, who is black, was in the room at the time and heard the exclamation. Jordan was offended and discussed the incident with two other co-workers, who told him that the employee had made similar comments before. Jordan then reported the incident to management. A month later Jordan was fired, purportedly because he was “disruptive,” his position “had come to an end,” and management personnel “don’t like you and you don’t like them.”
Jordan sued IBM and Alternative Resources Corporation (“ARC”), alleging that they jointly were his employer, for retaliation in violation of Title VII of the Civil Rights Act of 1964, and for breach of contract, fraud, and violations of local employment laws. Pursuant to the motion of IBM and ARC, the district court dismissed the complaint by order dated March 30, 2005, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and entered judgment on April 26, 2005. The court held that Jordan was not protected by Title VII from his employers’ retaliation because no objectively reasonable person could have believed that, in reporting the incident to management, Jordan was opposing an unlawful hostile work environment.
Jordan appealed, and, for the reasons that follow, we affirm.
I
In his complaint, Jordan alleges that in October 2002, he was employed jointly by ARC and IBM in Montgomery County, Maryland, because of the business relationship between the companies. He had entered into an at-will employment relationship with ARC in December 1998 as a network technician and, before October 2002, had been assigned to work at the IBM office in Gaithersburg, Montgomery County, Maryland.
Jordan alleges that, while in the network room at IBM’s office on October 23, 2002, he heard his co-worker, Jay Farjah, who was watching television, exclaim — not directly to Jordan but in his presence— “They should put those two black monkeys in a cage with a bunch of black apes and let the apes f — k them.” Farjah was speaking to the television in response to a report that John Allen Muhammad and Lee Boyd Malvo had been captured.*
*337 Over a period of three weeks, Muhammad and Malvo shot 13 people in public places in the greater Washington, D.C. metropolitan area from hidden positions. They killed 10 people and seriously wounded 3. Soon after the snipers’ names and a description of their car were released by Montgomery County police late on October 23, Malvo and Muhammad were arrested. Jordan and Farjah were watching this breaking news report on a television at the IBM facility.
In his complaint, Jordan states that he was offended by Farjah’s statement and reported it to two IBM supervisors, Mary Ellen Gillard and C.J. Huang, explaining that he believed that Farjah should not utter racist comments in the office. After Gillard spoke with Farjah, who claimed that he only said, “They should put those two monkeys in a cage,” Jordan told Gil-lard he was going to raise his complaint with Ron Thompson, IBM’s site manager. Jordan also complained to ARC manager Sheri Mathers.
Jordan alleges that during the month following his complaints about Farjah’s inappropriate statement, Gillard delayed Jordan’s work shift by two-and-a-half hours and gave him additional work assignments. Jordan also alleges that Huang made a derogatory remark and gestured toward Jordan at an office Thanksgiving party. On November 21, 2002, ARC manager Mathers telephoned Jordan and fired him because, as Jordan alleges, he was “disruptive,” his position “had come to an end,” and IBM employees and officials “don’t like you and you don’t like them.”
Alleging retaliatory discharge in violation of 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 1981, and related state laws, Jordan sued IBM and ARC based on his claim that they fired him for complaining about Farjah’s statement. IBM and ARC filed a motion under Federal Rule of Civil Procedure 12(b)(6), alleging that the complaint failed to state a claim upon which relief can be granted. While the defendants’ motion to dismiss was pending, Jordan filed a motion for leave to file an amended complaint to add an allegation that after hearing Farjah’s remark, he discussed it with several co-workers, and “[a]t least two of the co-workers told Jordan that they had heard Farjah make similar offensive comments many times before.” Jordan also proposed to add new state law claims for breach of contract, fraud, and wrongful discharge.
The district court granted the defendants’ motion to dismiss, and in doing so not only ruled on the original complaint, but also considered the proposed amended complaint, concluding that it too failed to state a claim upon which relief could be granted. The court held that IBM and ARC could not be liable for retaliation because “Plaintiff has failed to allege that he engaged in a statutorily protected activity.” As the court explained, “A plaintiff bringing a claim under the opposition clause of Title VII must at a minimum have held a reasonable good faith belief at the time he opposed an employment practice that the practice was violative of Title VII” (internal quotation marks, alterations, and citation omitted). The court concluded that “Farjah’s comment, which [Jordan] does not allege was directed at him, simply is not such a violation.” Addressing the proposed amended complaint, the court stated that the additional facts alleged
still [do] not make “objectively reasonable” Plaintiff’s belief that Defendants engaged in unlawful employment practices by allowing an abusive working environment to persist.... [N]o facts are alleged to indicate that these prior *338 comments, taken alone or in conjunction with the incident involving Plaintiff, constituted a hostile work environment. Plaintiffs amended complaint does not specify the frequency, severity, or nature of the -prior comments, nor even any aspect of their content; it merely states that “two of the co-workers told Jordan that they heard Farjah make similar offensive comments many times before.”
From the district court’s April 26, 2005 judgment dismissing Jordan’s complaint, Jordan filed this appeal.
II
Our review of an order granting a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) is de novo and focuses only on the legal sufficiency of the complaint. In conducting this review, we “take the facts in the light most favorable to the plaintiff,” but “we need not accept the legal conclusions drawn from the facts,” and “we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.” Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P’ship, 213 F.3d 175, 180 (4th Cir.2000); see also Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003).
III
At the heart of Jordan’s complaint is the allegation that IBM and ARC retaliated against him because he complained about Farjah’s racist exclamation, made in response to a television report that the two snipers had been captured. Farjah’s comment, directed at the news report, was the only time that Jordan had ever heard a racist comment from Farjah. Moreover, Jordan does not complain of any other similar statements made to him by others or heard by him in the workplace. He contends, however, that his complaint about Farjah’s comment involved an “incipient violation” of Title VII and therefore is protected by § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) (prohibiting discrimination when an employee has opposed a practice made unlawful by Title VII). Otherwise, as Jordan argues, “[F]ew workers would accept this early-reporting invitation [to report violations] if they knew they could be fired for their efforts.”
IBM and ARC contend that Title VII protects an employee against retaliation for opposing workplace conduct only if the employee had both a subjective belief and an objectively reasonable belief that the employer had engaged in activity that violated the discrimination statutes. The defendants argue that on the facts alleged in this complaint, Jordan’s belief could not have been objectively reasonable because “a plethora of authority holds squarely to the contrary ... [that] a single verbal incident in the workplace, no matter how racially charged, is [insufficient to create a racially hostile work environment.” They assert that “because the law on this point is so clear, Jordan [could not] have held an objectively reasonable belief to the contrary.”
The relevant provision of Title VII reads:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter.
42 U.S.C. § 2000e-3(a). The plain meaning of the statutory language provides protection of an employee’s opposition activity when the employee responds to an actual unlawful employment practice. Reading the language generously to give effect to its purpose, however, we have also held that opposition activity is protected when it responds to an employment practice that the employee reasonably believes is unlawful. EEOC v. Navy Fed. Credit Union, *339 424 F.3d 397, 406-07 (4th Cir.2005) (citing United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist., 367 F.3d 245, 255 (4th Cir.2004), vacated on other grounds 545 U.S. 409, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005); and Neolon v. Stone, 958 F.2d 584, 590 (4th Cir.1992)); see also Peters v. Jenney, 327 F.3d 307, 320-21 (4th Cir.2003). Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue may be resolved as a matter of law. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (resolving the objective reasonableness of Title VII plaintiffs beliefs through the summary judgment procedure).
The “unlawful employment practices” that an employee can oppose, and thereby be protected from retaliation, include practices that “discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race.” 42 U.S.C. § 2000e-2(a)(l). Such discrimination includes maintaining a racially hostile work environment, i.e., a “workplace ... permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted)). Courts determine “whether an environment is sufficiently hostile or abusive by ‘looking at all the circumstances,’ including the ‘frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.’” Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367); see also Breeden, 532 U.S. at 270, 121 S.Ct. 1508 (“[WJorkplace conduct is not measured in isolation”). “A recurring point in these opinions is that simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.” Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (citations and internal quotation marks omitted).
Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. See Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (“Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the cumulative effect of individual acts”); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001).
In this case, both Jordan and the defendants agree that Jordan’s complaint to IBM and ARC’S managers was opposition activity and that the only conceivable unlawful employment practice that Jordan could have been opposing was a hostile work environment. Thus, the question reduces to whether Jordan complained about an actual hostile work environment or, if there was not one, whether Jordan could reasonably have believed there was one.
A
On the question of whether Jordan was complaining of an actual hostile work environment made unlawful by Title VII, we conclude that he was not. While Farjah’s comment on October 23, 2002 (or October 24) was unacceptably crude and *340 racist, it was an isolated response directed at the snipers through the television set when Farjah heard the report that they had been arrested. Because the remark was rhetorical insofar as its object was beyond the workplace, it was not directed at any fellow employee. Moreover, it was a singular and isolated exclamation, having not been repeated to Jordan or in his presence before or after October 23, 2002. Jordan does not and cannot allege in his complaint that Farjah’s comment altered the terms and conditions of his employment. Based on all that Jordan knew, Jordan concluded that the remark reflected unacceptable racism and should not have been made. And while we agree with Jordan’s sentiment, we conclude that such an allegation is a far cry from alleging an environment of crude and racist conditions so severe or pervasive that they altered the conditions of Jordan’s employment with IBM or ARC. The complaint does not describe a workplace permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm. See Faragher, 524 U.S. at 787-88,118 S.Ct. 2275.
B
The question of whether Jordan could reasonably have believed that he was complaining of a hostile work environment made unlawful by Title VII requires more discussion and must be determined through an objective-reasonableness inquiry, as exemplified by our decision in EEOC v. Navy Federal Credit Union, 424 F.3d 397 (4th Cir.2005).
In Navy Federal, management had concocted a secret and elaborate scheme to create an unfavorable personnel record and then, based on the fabricated record, fire a black female employee in retaliation for her internal complaints about race, sex, and age discrimination. The employee’s supervisor refused to participate in the plan. When the supervisor’s employment was terminated because the supervisor resisted management’s plan, the EEOC sued Navy Federal for retaliation. We held that the supervisor’s resistance and refusals were opposition activity protected by § 2000e-3(a) even though Navy Federal’s management had not yet accomplished its discriminatory scheme by firing the black female employee. Thus, even though Navy Federal probably was not yet liable for actually discriminating against the black female employee, we held that the supervisor nonetheless held “a reasonable belief that Navy Federal was unlawfully retaliating” against the employee because management “[had] set in motion a plan to terminate [the black female employee] in retaliation for her complaints of racial discrimination, while at the same time seeking to conceal their improper motives.” Navy Federal, 424 F.3d at 407 (emphasis added). Stated otherwise, because there was no question that Navy Federal’s plan, if accomplished, would have resulted in a Title VII violation and management had unmistakably begun to implement the plan, we held that the supervisor could reasonably have believed that she was opposing an employment action made unlawful by Title VII. Indeed, but for the supervisor’s opposition, Navy Federal’s management would have succeeded in their attempted unlawful discrimination.
In this case, Jordan argues that he had an objectively reasonable belief that Title VII was about to be violated because “had [Farjah] continued, unabated, his conduct would at some point have ripened into [a] racially hostile work environment.” While in the abstract, continued repetition of racial comments of the kind Farjah made might have led to a hostile work environment, no allegation in the complaint suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur. Navy Federal holds that an employee *341 seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress. Under § 2000e-3(a) as construed by Navy Federal, we cannot simply assume, without more, that the opposed conduct will continue or will be repeated unabated; rather, the employee must have an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes.
When considering the facts alleged by Jordan in his complaint, no objectively reasonable person could have believed that IBM’s Montgomery County office was in the grips of a hostile work environment or that one was taking shape. That is, no objectively reasonable person could have believed that the IBM office was, or was soon going to be, infected by severe or pervasive racist, threatening, or humiliating harassment. Jordan had been employed at the location for four years and had not complained of any racist or abusive incidents. On the day in question, Jordan overheard Farjah speak a single abhorrent slur prompted by — though not excused by — a breaking news report. As Jordan acknowledges in his complaint, Farjah was in Jordan’s presence at the time, but he was not talking directly to Jordan or to any employee. Although Jordan could reasonably have concluded that only a racist would resort to such crudity even in times when emotions run high, the mere fact that one’s coworker has revealed himself to be racist is not enough to support an objectively reasonable conclusion that the workplace has likewise become racist.
Jordan’s proposed amended complaint added allegations that, after hearing Farjah’s comment, Jordan spoke to several coworkers and two of them referred to some similar statements made by Farjah in the past. But Jordan never experienced them, nor did he witness a workplace affected by them. From his coworkers’ vague references, Jordan did not know about where or when such statements were made, or what Farjah said except that the statements were similar. There is, moreover, no allegation that any of those earlier statements interfered with Jordan’s or any other employee’s work performance, were complained about, or gave rise to a hostile environment at Jordan’s workplace. Although these observations tended to confirm that Farjah makes racist comments, no allegation reasonably supports the inference that they were likely to recur at a level sufficient to create a hostile work environment. Jordan rests his case on the assumption that Farjah would repeat the remarks that he made on October 23 more frequently than his past history indicates; Jordan makes no allegations justifying this assumption.
Arguing for a rule that would protect virtually any complaint about a racist remark, Jordan maintains that, as a policy matter, “it is imperative that employees report harassment early” and that, in this case, he “was acting to prevent a hostile environment from arising.” He argues that the Navy Federal reasonableness requirement stands in tension with the early reporting policy incentives discussed in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher, 524 U.S. at 806, 118 S.Ct. 2275, especially because we have held that employers are not liable for an employee’s unlawful harassment of another employee if the harassed employee has unreasonably refused to report or has unreasonably waited many months before reporting a case of actual discrimination. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267-68 (4th Cir.2001); see also Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 269-70 (4th *342 Cir.2001) (holding that an employee need not forestall reporting a workplace harasser in order to “collect evidence” against him so long as the conduct was actionable, i.e., that it was unwelcome, based on the employee’s gender, “and sufficiently pervasive or severe to alter the conditions of employment ”) (emphasis added). Employees, Jordan argues, are left in “a double-bind — risking firing by reporting harassing conduct early, or waiting to report upon pain of having an otherwise valid claim dismissed.”
Jordan’s dilemma, that the law is inconsistent by both encouraging and discouraging “early” reporting, is presented too abstractly. The strong policy of removing and preventing workplace discrimination can and does coexist with Navy Federal’s objective reasonableness standard — a standard that pervades Title VII jurisprudence. See Burlington Northern & Santa Fe Ry. Co. v. White, — U.S.—,—, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345,—(2006). If Jordan were right, our opinion in Navy Federal would have been considerably shorter. We would not have provided an analysis of the reporting employee’s reasonable belief in the existence of a Title VII violation. Rather, we would have concluded more simply that, by reporting on her supervisor’s uncompleted yet abstractly illegal scheme, the Navy Federal plaintiff was protected by the policy favoring early reporting. Navy Federal recognized, however, that despite this policy, Congress did not write the antiretaliation provision in Title VII to protect employees who, with no more than good faith, complain about conduct that no reasonable person would believe amounts to an unlawful employment practice.
Jordan overlooks the fact, which is fundamental to Title VII jurisprudence, that there is a difference between an isolated racial slur, which is always and everywhere inappropriate, and the sort of severe or pervasive conduct that creates a hostile work environment. “Title VII does not prohibit all verbal or physical harassment in the workplace.” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); see also id. (reasoning that Title VII will not become “a general civility code for the American workplace!’ so long as courts pay “careful attention to the requirements of the statute”). Although the distinction between a racial slur and a hostile workplace may at a highly abstract level seem a difficult one for employees to manage, the distinction should not be conceived of in the abstract but rather in light of the Navy Federal objective reasonableness standard, which serves to protect an employee’s judgment in a close case. Objectively reasonable employees can and do recognize that not every offensive comment will by itself transform a workplace into an abusive one. Therefore it sometimes will not be reasonable for an employee to believe that the isolated harassing event he has witnessed is a component of a hostile workplace that is permeated with discriminatory intimidation, ridicule, and insult.
Moreover, Jordan’s dilemma is at its core a false dilemma, comparing the qualitative requirement of objective reasonableness in reporting with the laches concept espoused in Faragher and developed in Matvia. See Faragher, 524 U.S. at 807, 118 S.Ct. 2275 (holding that an employee cannot “unreasonably fail[ ] to take advantage of any preventive or corrective opportunities” (emphasis added)); Matvia, 259 F.3d at 270 (holding that an employee who waited nearly three months after the first actionable incident of sexual harassment waited too long). When he argues that he risks being fired by reporting too early, he refers to reporting when there is insufficient conduct about which to complain; but when he argues that he risks dismissal *343 of his claim by reporting too late, he refers to the inordinate time delay as described in Matvia. The concepts are not comparable and create no dilemma.
 The time constraint of Matvia, moreover, is of limited applicability in any comparison because it only prevents an employee who waited unreasonably long to take advantage of an employer’s antiharassment policy from overcoming the employer’s affirmative defense based on the existence of that policy under Ellerth and Faragher. But the employee can belatedly report discriminatory conduct and still be protected from retaliation. The employee enjoys that immunity so long as he reports an unlawful employment practice or an employment practice that an objectively reasonable employee would believe is unlawful. Thus, an employee who unreasonably delays acting on his discrimination claim and thereby loses his right to a judicial remedy under Matvia still has the incentive to report the unlawful conduct, under the protection of the anti-retaliation statute, because of the increased likelihood that his employer will remedy the conduct extra-judicially in order to maintain the effectiveness of its antidiscrimination policy-
As the law stands, employees are not subject to conflicting incentives. Complaining employees are protected by Title VII once they have an objectively reasonable belief that a Title VII violation has occurred, and they have a reasonable amount of time in which to bring their concern to their employers’ attention if they want to protect their right to sue their employers. Only at an impermissibly high level of generality, where meaningful distinctions can no longer be observed, can it be argued that the law inconsistently encourages employees to report and at the same time not to report violations, and Jordan’s argument, if accepted, would lead to the adoption of a new rule that protects employees who have no reasonable belief that a Title VII violation has occurred, contrary to the statutory limits of the law. When considered in actual application, the objective reasonableness standard protects the reporting employee.
Jordan’s argument that the Navy Federal rule creates a perverse incentive for employers to “fire workers quickly before they have [Title VII] claims” is hyperbolic. Employers who trap employees by firing those who use their antiharassment reporting procedures could very well lose their affirmative defense in cases where employees do not report suspected violations, for this circuit requires that employers prove, by a preponderance of the evidence, that their antiharassment policies are “effectively enforced” before they may use such policies to defeat discrimination claims. White v. BFI Waste Servs., LLC, 375 F.3d 288, 299 (4th Cir.2004).
Congress limited the scope of retaliation claims, and Navy Federal amply, indeed generously, protects employees who reasonably err in understanding those limits. We are unwilling to extend Navy Federal and establish a rule tantamount to a statutory civility code. Accordingly, we affirm the district court’s conclusion that Jordan’s complaint in this case, as well as his proposed amended complaint, fails to state a claim upon which relief can be granted.
IV
The remaining counts of Jordan’s complaint, which are grounded essentially on the same core allegations that support his Title VII claim, fail to state claims upon which relief can be granted for reasons similar to or deriving from those supporting dismissal of his Title VII claim.
With respect to his claims for unlawful retaliation under 42 U.S.C. § 1981 and Montgomery County Code § 27- *344 19(c)(1), Jordan acknowledges that the applicable principles are the same as those for determining liability under Title VII. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir.2004) (with respect to § 1981); Magee v. DanSources Technical Servs., Inc., 137 Md.App. 527, 769 A.2d 231, 252-53 (2001) (with respect to the Montgomery County Code). Because there is no actionable Title VII retaliation alleged, these claims based on the same analysis must also fail.
V
Jordan also contends that the district court erred in dismissing his discrimination claim under 42 U.S.C. § 1981 — as distinct from his retaliation claim — for failing to state a claim upon which relief can be granted. Citing Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), he argues that under notice pleading he may state a claim upon which relief can be granted by relying on his complaint, which alleges 24 paragraphs of facts and concludes with the allegation that “his race was a motivating factor” in being fired. Because the concluding allegation is supported by neither the alleged facts nor the fair inferences to be drawn from them, the defendants contend that it is no more than a conclusory allegation that “does not satisfy any pleading standard.” Jordan responds that he does not rely on the single allegation that his race was a motivating factor and that the single allegation should not be read in isolation. The count alleging a § 1981 discrimination claim, he states, “incorporates all prior factual allegations detailed in the complaint,” and the final conclusory allegation follows from the facts alleged. He maintains that his complaint is significantly more detailed than that upheld in Swierkiewicz.
In alleging his § 1981 discrimination claim, which is Count VII of his complaint, Jordan did incorporate by reference paragraphs 1-24 of the complaint, and thus, as he claims, these paragraphs constitute the facts of Count VII. The 24 paragraphs, which constitute the only factual allegations of the complaint, begin with the summary that the defendants fired Jordan “because he complained about conduct that he reasonably believed constituted a hostile work environment or would, if unabated, constitute such an environment.” After alleging jurisdiction and describing the parties, he sets forth the specific events that formed the grounds of his complaint. First, he describes the event on October 23, 2002, when Farjah made the racist remark while he and Farjah were standing in IBM’s network room watching a television report about the capture of Malvo and Muhammad. He alleges also that on that same day he reported the remark to coworkers and to three different managers. He related how one of the managers reported back that Farjah denied making the remark in the form alleged by Jordan. Jordan thereafter reported the remark to another manager. Finally Jordan alleges that the defendants retaliated against him for reporting the remark, first by changing his schedule and his job assignments and then, about a month later, by firing him. The complaint alleges that when Jordan was notified about being fired, the defendants gave as their reasons that Jordan was “disruptive,” his position “had come to an end,” and that “IBM ‘don’t like you and you don’t like them.’ ” Jordan alleges that these reasons were a pretext and that the real reason for which he was fired was “his opposition to Farjah’s racially offensive statement.”
After setting forth these facts and incorporating them into Count VII, the complaint concludes with the allegation that “Jordan’s race was a motivating factor in the conduct and decisions of IBM and/or ARC.”
*345 In evaluating Count VII on the defendants’ motion to dismiss under Rule 12(b)(6), the district court read it as alleging that Jordan was fired for reporting a racist remark but as failing to demonstrate any basis from which to conclude that his own race “played any role in his termination.” The court observed that the only person alleged to have engaged in racist conduct was Farjah, and “Farjah [was] not alleged to have contributed to Jordan’s termination.” The court concluded:
His § 1981 claim is therefore insufficient as a matter of law. Although no facts alleged thus far have indicated that Defendants discriminated against Plaintiff because of his race, the court will permit Plaintiff to amend this count to allege any such facts.
Jordan elected to rest on his complaint as written, advising the district court that he would not avail himself of the opportunity to amend and requesting the court to enter a final judgment on his § 1981 discrimination count.
Only now, for the first time in his reply brief on appeal, does Jordan provide a theory of how his complaint purports to state a claim of racial discrimination under § 1981. He states:
The facts in this case raise a strong inference, of retaliation, but they also raise an inference of discrimination based on race. When appellees learned that an IBM employee, Jay Farjah, made a crude racist remark to Robert Jordan, they took no action against Farjah and instead fired Jordan, an African-American employee who asked them to stop the offensive behavior. This raises an inference that the relevant managers tolerated racist comments, or even condoned them. And since Farjah had made similar comments many times before, a jury could infer that this conduct was nothing new for the managers. Tolerating or condoning racist comments in the workplace is itself evidence of racial bias, ... and evidénce of bias, along with the unexplained firing of a good employee, is a sufficient factual basis for a jury to conclude that Jordan was treated more harshly in his situation than he would have been if he were white.
For a § 1981 discrimination claim, Jordan must allege that he is a member of a racial minority; that the defendants’ termination of his employment was because of his race; and that their discrimination was intentional. See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir.1993). In his complaint, however, Jordan has not demonstrated how Farjah’s racism could be imputed to the defendants on a basis by which relief under § 1981 could be afforded. Instead of amending his complaint to ■ state a viable claim, Jordan simply rested on his illogical conclusory statement that his race was a “motivating factor” for his firing, without explaining how that conclusion is consistent with the allegations that he has made. In just such circumstances, we have rejected reliance on similar conclusory allegations, particularly when the plaintiff, like Jordan, has purported to set forth in detail the facts upon which his claims are based. See Bass, 324 F.3d at 765 (holding that conclusory allegations that the employer discriminated against the plaintiff “because of her race and sex” were not sufficient to allege a claim when the facts of the complaint did not support the conclusory allegation); see also Eastern Shore Mkts., 213 F.3d at 180 (in reviewing a Rule 12(b)(6) motion, “[w]e need not accept the legal conclusions drawn from the facts”).
Jordan first defends his purported allegation of a § 1981 discrimination claim by contending that it conforms to the lenient standards of notice pleading permitted by the rules and affirmed in Swierkiewicz. *346 But the district court’s dismissal order was not premised on Jordan’s failure to give notice of his claim to the parties. Rather, it concluded that what was alleged failed to state a discrimination claim under § 1981 upon which relief can be granted. Even with notice pleading, a complaint purporting to describe the events justifying relief must nonetheless demonstrate that relief can be granted in those circumstances.
Rule 8(a) of the Federal Rules of Civil Procedure provides that a complaint filed in federal court must contain, inter alia, “a short and plain statement of the claim showing that the pleader is entitled to relief.” Fed.R.Civ.P. 8(a)(2). And Rule 12(b)(6) authorizes dismissal of a complaint that “fails to state a claim upon which relief can be granted.” The holding in SwierTciewicz does not eliminate the need to comply with these rules. In Swierkiewicz the Supreme Court held that the Second Circuit’s “heightened pleading standard,” requiring a civil rights plaintiff to plead facts that constitute a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), demanded too much of the pleader. The Court observed that the plaintiffs case might not even depend on a demonstration of the prima facie case under McDonnell Douglas. As the Court stated:
[Ujnder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the McDonnell Douglas framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case.
* * *
It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered.
534 U.S. at 511-12, 122 S.Ct. 992. But that holding, which recognizes that the prima facie case is a standard of proof distinct from the essential elements of a cause of action, left untouched “the burden of a plaintiff to allege facts sufficient to state all the elements of her claim.” Bass, 324 F.3d at 765 (emphasis added); see also Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002) (“[T]he Supreme Court’s holding in Swierkiewicz v. Sorema did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim” (internal citation omitted)).
Consequently, when a plaintiffs complaint sets forth facts in support of his claim for relief and tracks the language of the applicable cause of action, the legal conclusions “are not talismanie” because “it is the alleged facts supporting those words, construed liberally, which are the proper focus at the motion to dismiss stage.” Bass, 324 F.3d at 765. In Bass, the' plaintiff pleaded that her employer discriminated against her “because of her race and sex.” Id. (quoting the plaintiffs complaint). Yet she supported this allegation with “a story of a workplace dispute regarding her reassignment and some callous behavior by her superiors,” which did “not seem to have anything to do with gender, race, or age harassment.” Id. Construing the Bass plaintiffs complaint in her favor, we were unable to determine how her story involved any discrimination “because of her race and sex.”
Jordan’s count for a § 1981 discrimination claim is similarly deficient. The count conclusorily states that the defendants violated § 1981 because race was a motivating factor in his termination. Yet the 24 paragraphs of facts that are made part of *347 that count provide no support for the violation, just as was the case in Bass. Like the district court, we cannot discern in his claim any way that Jordan’s race factored into his termination.
To salvage his claim, Jordan argues for the first time on appeal that “inferences” may be drawn from his complaint to support a § 1981 discrimination claim. He states (1) that his managers must be racist because they did not fire the racist but did fire him, and (2) that in firing him, his managers treated him more harshly than they did white employees.
These matters, however, are not alleged in the complaint, and they cannot now be taken as amendments to the complaint. Indeed, the district court gave Jordan ample leeway and opportunity to amend his complaint, an opportunity that Jordan refused.
Moreover, these new allegations are not fair inferences inasmuch as they are mere speculation and argument. It does not follow that a manager who does not fire an alleged racist is therefore himself a racist, and it does not follow that a racist who fires an employee did so because of his racism. There is also no basis in the complaint to conclude that Jordan, as a complaining black employee, was treated differently from a white complaining employee. Indeed, there is no suggestion that any employee other than Jordan complained to management about a racist comment.
Jordan’s “inferences” thus are simply unwarranted inferences that do not provide support for a statement of claim. See Eastern Shore Mkts., 213 F.3d at 180.
Accordingly, we affirm the district court’s order dismissing Jordan’s discrimination claim under 42 U.S.C. § 1981.
VI
Jordan also claims that “IBM’s conduct constituted other unlawful behavior” as described in Montgomery County Code §§ 27 19(c)(2)-(c)(4). Section 27-19(c)(2) prohibits assisting in, compelling, or coercing discriminatory practices prohibited by the Code. The only discriminatory practice prohibited by the Code that Jordan alleges is § 27-19(c)(l) retaliation, but because he has not stated a claim for which relief can be granted under that provision, he cannot state an assistance claim under § 27-19(c)(2). The same reasoning compels the dismissal of Jordan’s § 27 — 19(c)(3) claim, for obstructing or preventing enforcement of the Code, and § 27-19(c)(4) claim, for attempting discriminatory practices prohibited by the Code.
VII
Jordan also purports to assert claims for fraudulent inducement or breach of contract. He alleges that IBM and ARC, by promulgating anti-harassment policies outlining steps for alerting supervisors to workplace harassment, encouraged him to report Farjah’s comment and then fired him for doing so.
In Maryland, a fraud claim must allege that a misrepresentation was made for the purpose of defrauding the plaintiff and that the misrepresentation’s falsity was known to the defendant. See Gross v. Sussex, Inc., 332 Md. 247, 630 A.2d 1156, 1161 (1993). But Jordan fails to allege that the defendants, in creating and distributing their policies, acted with a purpose to defraud and with the knowledge that representations made by them were false. The fraud claim must fail for lack of those essential elements.
Jordan’s claim for breach of contract must fail because IBM’s and ARC’S anti-discrimination policies were not en *348 forceable contracts. While Jordan concedes this fact, he argues that we should apply promissory estoppel to “prevent injustice.” Maryland courts, which disapprove of the term “promissory estoppel,” have incorporated the Restatement (Second) on Contracts to adopt the analogous doctrine of “detrimental reliance,” a tort that does not sound in fraud. See Pavel Enterprises, Inc. v. A.S. Johnson Co., 342 Md. 143, 674 A.2d 521, 532 (1996); id. at 533 n. 29. To show detrimental reliance on a promise, Jordan must allege a clear and definite promise. But the policies of both IBM and ARC expressly disclaim creating enforceable obligations. Moreover, the policies do not clearly promise that employees will not be discharged if they report conduct they believe to be harassment.
VIII
Jordan also claims that IBM tortiously interfered with his ARC employment contract, pleading this claim in the alternative on the assumption that IBM was not his joint employer. In response to the district court’s dismissal of this claim because Jordan was an at-will employee, Jordan now argues that his ARC employment was contractual “in nature,” albeit not a contract for a fixed term and thus terminable at will.
In Macklin v. Robert Logan Assocs., 334 Md. 287, 639 A.2d 112, 113 (1994), the Maryland Court of Appeals noted the existence of a “broader right” that entitles a plaintiff to sue even when “no contract or a contract terminable at will is involved”- — -the right to be protected from interference with economic relations. Thus, Jordan’s tortious interference claim must be analyzed as a claim for interference with economic relations. See Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., 336 Md. 635, 650 A.2d 260, 268 n. 13 (1994) (“Interference with a contract terminable at will is analyzed as interference with economic relations broadly, and not. interference with a specific contract”). Interference with economic relations requires showing tortious intent and wrongful or improper conduct. Macklin, 639 A.2d at 119. In Alexander & Alexander, the Court of Appeals held that “wrongful or malicious interference with economic relations is interference by conduct that is independently wrongful or unlawful” and went on to identify such conduct as “violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.” 650 A.2d at 271 (emphasis added) (internal quotation marks omitted).
Jordan has not alleged any conduct that is independently unlawful and accordingly fails to state a claim upon which relief can be granted.
IX
Finally, Jordan alleges that he was wrongfully discharged.
Although the Maryland Court of Appeals acknowledges the general rule that an at-will employee can be fired at any time, it has also created an exception that an employer cannot fire an at will employee for a reason that violates a statute or public policy. See Adler v. Am. Standard Corp., 291 Md. 31, 432 A.2d 464 (1981). In Adler, the court specifically held that the complaint must allege that the employee’s discharge “contravened some clear mandate of public policy.” Id. at 473. But such a claim may not become a substitute for violations of public policy for which a statute provides -its own remedies. See Makovi v. Sherwin-Williams Co., 316 Md. 603, 561 A.2d 179 (1989).
*349 While Jordan alleges that his discharge violates “Maryland public policy[, which] prohibits employers from punishing employees who report racially offensive behavior that they believe in good faith violates anti-discrimination laws,” Maryland already provides statutory remedies for employees alleging retaliation, and those laws’ objective criteria indicate that there is no public policy to protect employees simply for subjectively acting in good faith. The district court properly dismissed this claim also.
For the foregoing reasons, the judgment of the district court is

'AFFIRMED.

 Jordan’s complaint alleges that Jordan and Farjah were watching the television report "immediately” after Muhammad and Malvo's capture on "October 23.” While Montgomery County police identified Muhammad and Malvo late in the evening of October 23, 2002, the two were not captured until the early morning hours of October 24, 2002. This discrepancy, however, is immaterial, and we assume what has been alleged in the com *337 plaint to be trae for purposes of reviewing the dismissal order.